IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLES FRANK SPENCE,

        Petitioner,                No. CIV S-03-1987 GEB JFM P

     vs.

ALEXANDER HICKMAN, Warden,

        Respondent.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a 1998 judgment of conviction entered against him on June 4, 1998[1] in the Sacramento County Superior Court on charges of first degree murder and second degree robbery, and the jury found the existence of a special circumstance in that petitioner committed the murder in furtherance of the robbery, and found that the principal in the felony was armed with a firearm. Because petitioner was 16 years old at the time of the crime, the trial court exercised its discretion and sentenced petitioner to state prison for a term of 25 years to life with the possibility of parole for the murder conviction, plus a one-year enhancement for the section 12022, subdivision (a)(1) finding. The imposition of sentence on the robbery conviction was stayed.

---

[1] Petitioner's co-defendant, Thomas John Smithson, was convicted on June 8, 1998. The case against both defendants was prosecuted in a single trial but before separate juries.

Petitioner seeks relief on the following grounds:  (1) denial of due process and the privilege against self-incrimination by errors in adjudicating petitioner's motion to exclude his custodial statement as a violation of his Miranda[2] rights; (2) insufficient evidence of first degree murder; (3) insufficient evidence of special circumstances; (4) ineffective assistance of counsel in failing to investigate and present evidence of petitioner's strongest defense, i.e. that his discussions with Smithson amounted only to mere preparation not amounting to aiding and abetting; (5) petitioner's right to testify was violated by the court's order that Smithson's attorney could cross-examine him and by the ineffective assistance of counsel in failing to investigate sufficiently to make an informed decision whether petitioner should testify under these circumstances; (6) ineffective assistance of counsel by counsel's failure to request a jury instruction that the evidence of petitioner's mental deficiencies and drug usage was relevant to determine whether petitioner harbored the mental state of an aider and abetter; and (7) deprivation of due process by an erroneous felony murder instruction that reduced the prosecutor's burden of proof beyond a reasonable doubt and misstated the elements necessary to be proven.

After careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

PROCEDURAL AND FACTUAL BACKGROUND[3]

> The case against both defendants was prosecuted in a single trial but before dual juries.  On June 4, 1998, one jury convicted [petitioner] of first degree murder (§ 187, subd. (a)) and second degree robbery (§ 211).  The jury found the existence of a special circumstance in that [petitioner] committed the murder in

---

[2]  In Miranda v. Arizona, the United States Supreme Court held that custodial interrogation must be preceded by advice to the potential defendant that he has the right to consult with a lawyer, the right to remain silent and that anything he says can be used in evidence against him.  384 U.S. 436, 469-73 (1966).

[3]  The following summary is drawn from the March 29, 2000 partially published opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at 3-13, filed in this court on March 5, 2004, as Ex. A to the petition.

furtherance of the robbery (§ 190.2, subd. (a)(17)), and found that a principal in the felony was armed with a firearm (§ 12022, subd. (a)(1)). Because [petitioner] was 16 years old at the time of the crime, the trial court exercised its discretion under section 190.5, subdivision (b), and sentenced [petitioner] to state prison for a term of 25 years to life with the possibility of parole for the murder conviction, plus a one-year enhancement for the section 12022, subdivision (a)(1) finding. The court stayed imposition of sentence on the robbery conviction pursuant to section 654.

On June 8, 1998, the other jury convicted Smithson of first degree murder (§ 187, subd. (a)), attempted robbery (§§ 211, 664), and of being a convicted felon in possession of a firearm (§ 12021). The jury found the existence of a special circumstance in that Smithson committed the murder in furtherance of the robbery (§ 190.2, subd. (a)(17)), and found that Smithson personally used a firearm in the commission of the crimes (§ 12022.5, subd. (a)). The trial court sentenced Smithson to life imprisonment without the possibility of parole for the murder conviction and special circumstance finding. The court also sentenced him to 10 years for the gun-use finding relating to the murder count and five years for the prior-conviction finding. The court stayed imposition of sentence on the other convictions and the gun-use finding on the robbery count pursuant to section 654. Both defendants timely appealed.

A. Evidence submitted to both juries

On the morning of April 18, 1997, 16-year-old Tonelli burglarized a home in the Orangevale area of Sacramento County. He stole a number of items, including a butterfly knife and $1,000 in cash consisting of nine $100 bills and two $50 bills. At about 10 a.m., Tonelli went to the house of a friend, Melissa Johnston, to share the news of his new wealth. Johnston saw Tonelli count the money and put it in his wallet. Tonelli left Johnston's home around noon on Johnston's bike headed for 7175 Woodmore Oaks where both [petitioner] and Smithson resided ("[petitioner's] residence"). Before leaving, Tonelli informed Johnston he would return later so he could take his friends to the mall and spend money on them.

Witnesses described [petitioner's] residence as a "crash pad" where a number of acquaintances of [petitioner] and his family lived at various times and used illegal drugs. Barbara Spence, [petitioner's] mother, owned a .38 caliber revolver which she kept on a shelf inside the headboard of her bed and behind her pillows fully loaded with five bullets. She also kept an ammunition box on her headboard. The box held 60 bullets. At that time, it contained 54 bullets. Five of the 60 were loaded in the gun, and a sixth had been previously fired. When she left for work that morning, she locked her bedroom door, as was her custom.

/////

Along the way to [petitioner's] residence, Tonelli met Frank Cianciolo, a house-mate of [petitioner] and Smithson. Tonelli told Cianciolo he was going to [petitioner's] residence and asked if [petitioner] was home. When Cianciolo informed him [petitioner] was home sleeping, Tonelli said he knew that because he had just spoken with Smithson by telephone.

At approximately 3:30 that afternoon, another resident of [petitioner's] residence, Aaron Umfleet, and his girlfriend, Marshelle Birchman, arrived at [petitioner's] residence to wash their laundry. Tonelli was there when they arrived. Umfleet informed Tonelli he did not have money he owed Tonelli, but Tonelli told him "don't trip." Tonelli stated he had $1,000 and fanned a large amount of cash before Umfleet.

Tonelli showed Umfleet a small baggie of methamphetamine and offered it to Umfleet. Smithson, however, stated Tonelli had already promised to give the drugs to him. Tonelli agreed, and did not give the drugs to Umfleet. Instead, Tonelli agreed to give Umfleet $150 to buy drugs, resell them at a profit, and then pay Tonelli back. During his time at [petitioner's] residence, it appeared to Umfleet that Smithson did not let Tonelli out of his sight.

At about 3:50 p.m., Birchman told Umfleet they had to leave, even though they had not yet washed their laundry. Smithson, who appeared to Umfleet to be "jacked up" on methamphetamine, also told Umfleet and Birchman at least three times they had to leave immediately. Smithson asked Umfleet to pick up some money for him. Umfleet replied he did not understand, but Smithson stated Birchman would understand.

Birchman, however, stated Smithson asked them to leave because a drug transaction was about to occur in the house and he needed them to leave for about 30 minutes. He told them he would give them $50 to give him a ride somewhere when they came back. Smithson had not offered that much money for a ride before.

As Umfleet and Birchman left, [petitioner] was sitting in his bedroom smoking marijuana. He was wearing pants and a white T-shirt at that time. Tonelli walked Umfleet and Birchman outside with Smithson following behind them. Tonelli then gave Umfleet the $150. When Umfleet and Birchman left, Tonelli, [petitioner], and Smithson were the only people they knew to be inside [petitioner's] residence at that time.

At some point after 4 p.m., [petitioner] arrived at the home of Jessica Hitson, located three houses away from [petitioner's] residence. [Petitioner] was crying. He was wearing pants but not a shirt, and was carrying his shoes. He did not have any blood on

/////

4

him. Hitson let [petitioner] into her house, and at 4:38 p.m. she telephoned "911."

Meanwhile, Smithson had placed a "911" telephone call at 4:36 p.m. In his opening brief, but without citing to the record, Smithson claims he was frantic during the call and told the operator Tonelli had been shot. He also mentioned Russian Roulette. The operator told Smithson to place a towel on Tonelli's neck to stop the bleeding.

Sheriff's deputies arrived at [petitioner's] residence shortly thereafter. They found Smithson in [petitioner's] bedroom kneeling over Tonelli with his right hand on Tonelli's neck. Tonelli was laying on his back on a mattress and was bleeding heavily. Smithson was asking for help and saying, don't die on me." Deputies noticed a handgun on the floor about five feet away from Smithson.

A deputy took custody of Smithson and placed him in the backseat of a patrol car. Smithson was frantic, crying, and had blood on his hands and shirt. While being escorted to the car, Smithson said, "I didn't mean it, we were just fooling around" and "it was an accident." When he first sat in the car, Smithson was concerned about the blood on his hand and asked the observing deputy to "please get this shit off me." When the deputy said he couldn't help him, Smithson repeated, "Oh God, help me please, oh, shit."

Smithson stayed in the car for approximately two-and-a-half hours. during that time, he made the following statements: "Is he going to be all right? Can you call and see if he is going to be all right? Please clean me up. I fucking told him. I fucking told him. Can you find out how he is? Let me out of here. Am I under arrest? Where did they take him? Where is he at? Please call my mom. Am I under arrest? Handcuff me or something. Why did this happen? If they put my face on TV I'll sue them. Please get me something to clean this off. I need to wash this off. Damn it, get this off me, please. What was he thinking?" When a television cameraman started filming Smithson through the car window, Smithson said, "Stupid, stupid, stupid, as stupid as, mother fucker, I have enough problems, asshole."

By the time paramedics arrived, Tonelli had died. Deputies recovered various items from the body, including a butterfly knife and a baggie of methamphetamine. Deputies also recovered Tonelli's wallet, but there was no money in it. Deputies, investigators and witnesses were unable to find any money at [petitioner's] residence.

At 4:44 p.m., another deputy reported to Hitson's home and found [petitioner] sitting on the floor crying and talking incoherently.

/////

5

The deputy detained [petitioner] in the rear seat of his patrol car and returned to [petitioner's] residence.

Subsequently, the deputies performed gunshot residue tests on [petitioner] and Smithson. The tests revealed only one particle of possible gunshot residue on the back of [petitioner's] left hand, but he had washed his hands prior to the test. Smithson's hands had blood on them. They also had gunshot residue particles, indicating he had either discharged a firearm or had been close to a firearm when it discharged. After completing the residue tests, deputies transported [petitioner] and Smithson to the sheriff's station in downtown Sacramento.

At [petitioner's] residence, deputies analyzed the blood found in [petitioner's] bedroom. They also found blood on the door handle and deadbolt on the inside of the front door of the house. They collected, among other items, the handgun, determined to be a .38 caliber Rossi revolver, a butterfly style knife, and a box of ammunition. The gun contained one spent shell casing. Smears and droplets of blood were on the gun which were determined to have been caused by back spattering from a high-impact or close contact gunshot wound. The droplets of blood on the gun and the back of Smithson's hands, along with the residue test results, were consistent with Smithson firing the weapon.

Forensic evidence demonstrated Tonelli was shot in the upper left neck. The gun was held so close to Tonelli's neck it left an imprint. The bullet traveled left to right, front to back and downward at an angle of about 45 degrees. It struck the right carotid artery, and exited out the back of the upper right arm. The pathologist who conducted the autopsy concluded the wound was not self-inflicted because the bullet's path angled downward into the neck, not upward into the head as most self-inflicted gunshot wounds in the neck tend to be.

B. Additional evidence submitted to [petitioner's] jury

Before [petitioner's] jury only, Hitson testified that after she let [petitioner] into her house, [petitioner] informed her Smithson had shot Tonelli. She asked [petitioner] if he had called the police yet, but he had not. [Petitioner] said Smithson was going to call the police and say Tonelli shot himself. Hitson then called "911" and [petitioner] joined in the phone conversation. After the phone call, Hitson gave [petitioner] a T-shirt to wear.

During the "911" telephone call, [petitioner] informed the operator that Smithson shot Tonelli. [Petitioner] had not seen what had happened because he had been in the bathroom. Smithson, though, had told [petitioner] that Smithson was going to take some money from Tonelli, and Tonelli grabbed the gun. Other than that, [petitioner] did not know what happened.

Before [petitioner's] jury only, the deputy sheriff who reported to Hitson's residence, Greg Gillum, testified that [petitioner] explained he had been at [petitioner's] residence with Smithson when Smithson received a phone call from Tonelli. Then Smithson asked [petitioner] if [petitioner] wanted to "come up" on some money. [Petitioner] interpreted that statement as meaning Smithson was going to take money from Tonelli. About 20 minutes after Tonelli arrived at [petitioner's] residence, [Petitioner] went into the bathroom. While there, [petitioner] heard what he thought was a loud knock on the wall. Smithson then came running in saying, "I shot him, I shot him. He grabbed for the gun, and I shot him." [Petitioner] saw what happened, then ran to Hitson's home. [Petitioner] informed Gillum the gun was his but it was not normally kept in his room. Gillum then detained [petitioner] in the rear seat of his patrol car for about an hour.

At the sheriff's station that evening, [petitioner] signed a form waiving his rights under *Miranda*, and gave a statement to a detective. He was videotaped while making his statement. [Petitioner's] jury, but not the Smithson jury, viewed the videotape and received a transcript of the statement. In his statement, [petitioner] said he had been sleeping when Smithson awoke him and asked if he wanted to "come up" on $500. Smithson said Tonelli had just called and was coming over with $1,000.

They discussed ideas about how to get the money from Tonelli. Ultimately, [petitioner] said he knew how to do it. He then walked to the door of his mother's bedroom, used a butter knife to open the locked door, and retrieved her gun from her bed. [Petitioner] told Smithson he would use the gun to make Tonelli empty his pockets and give them the money and then make him leave. Smithson nodded in agreement.

They went back to [petitioner's] room where [petitioner] put the gun under his pillow and laid down on it. About five minutes later, Tonelli arrived. Smithson let Tonelli in, they talked for a few minutes, and then walked back to [petitioner's] bedroom where [petitioner] was still laying on his bed. Tonelli showed them some of the money and put the cash back in his wallet. Tonelli said he only had $900 then. They engaged in some drug use. [Petitioner] asked Tonelli to retrieve the phone for him so he could call his girlfriend, which Tonelli did.

Smithson suggested Tonelli bring Tonelli's bike into the house so it would not be stolen. When Tonelli left the room to do so, [petitioner] informed Smithson he did not want to go through with their plan. But [petitioner] asked Smithson if Smithson was going to "do it." Smithson said "Yeah" and asked for the gun. [Petitioner] handed him the gun.

/////

7

Smithson stood up and placed the gun behind the waistband of his pants and under his shirt. Shortly thereafter, Tonelli walked back into the bedroom. [Petitioner] then excused himself so he could use the bathroom, in part because he had to and also because he did not want to be present when Smithson robbed Tonelli.

[Petitioner] went into the bathroom and shut the door behind him. After urinating, he turned on the water in the sink to wash his face and run water through his hair. While the water was on, he heard a "real hard thump on the bathroom door." While [petitioner] was looking for a towel, the bathroom door flew open and Smithson came in yelling, "I shot him. I shot him. He grabbed the gun. It ain't my fault. It ain't my fault. He grabbed the gun. He grabbed the gun."

Yelling "no, no, no," [petitioner] went back into his bedroom, grabbed his shoes, and saw Tonelli lying face-up on the bed choking on blood. Smithson still had the gun in his hands, and was wiping it off with his shirt. [Petitioner] repeatedly told him to call "911." Smithson said he would, and that he would tell the operator Tonelli was smoking methamphetamine and shot himself. [Petitioner] turned to leave out the front door to go to Hitson's house. While leaving, [petitioner] saw Smithson unload the gun and drop the bullets onto the kitchen table.

[Petitioner] admitted he knew his mother's gun was loaded when he retrieved it. He also stated that even though he did not want to participate in the robbery, he did not suggest that they not commit the act because "$900 sounded good" to him. Despite not wanting to use the gun on Tonelli, [petitioner] still believed Smithson would split the money with him.

[Petitioner] stated he and Tonelli were friends. Yet [petitioner] wanted to rob Tonelli because [petitioner] was "being greedy" and because Tonelli had stolen from him before. [Petitioner] had not intended to shoot Tonelli, and he never thought about what would happen if Tonelli resisted or reported the crime to the police.

(Opinion at 3-13.)

Petitioner filed a timely appeal of his conviction on September 24, 1998. (CT at 863.) Petitioner's judgment of conviction was affirmed by the California Court of Appeal for the Third Appellate District on March 29, 2000. (Answer, Ex. A.) On July 19, 2000, the California Supreme Court denied review. (Pet., at 2; Answer, Ex. B.)

On October 18, 2001, petitioner filed a petition for writ of habeas corpus in the Sacramento County Superior Court which was denied November 13, 2001. (Answer, Ex. C.)

On April 25, 2002, petitioner filed a petition for writ of habeas corpus in the California Third District Court of Appeal which was denied May 2, 2002. (Answer, Ex. D.)

On January 21, 2003, petitioner filed a petition for writ of habeas corpus in the California Supreme Court which was denied September 17, 2003. (Answer, Ex. E.)

The instant petition was filed on September 23, 2003. After resolution of the motion to dismiss, respondent filed an answer to the petition on March 5, 2004. Petitioner filed a traverse on May 5, 2004.

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ

simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

Regarding section 2254(d)(2), a state court factual determination is unreasonable if it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997). Factual determinations made by a state court are presumed to be correct, and a habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id.

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d 104, 109 (2nd Cir. 2003); accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S.Ct. at 853. However, such "deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041 (2003); see also Hall v. Director of Corrections, 343 F.3d 976, 984 n.8 (9th Cir.2003)("AEDPA, although emphasizing proper and due deference to the state court's findings, did not eliminate federal habeas review.").

Even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S.Ct. 1710 (1993). Under this standard, petitioner "may obtain plenary review of [his] constitutional claims, but [is] not entitled to habeas relief based on trial error unless [he] can establish that it

resulted in 'actual prejudice.' " Brecht, 507 U.S. at 637, citing United States v. Lane, 474 U.S. 438, 439, 106 S.Ct. 725 (1986).

II. Petitioner's Claims

   A. First Claim

      Petitioner identifies his first claim as follows:

> Denial of due process and privilege against self incrimination by errors in adjudicating petitioner's motion to exclude his custodial statement as a violation of Miranda.

(Pet. at 3.)  The supporting facts are set forth as follows:

> The superior court refused to afford petitioner an evidentiary hearing on his Miranda claim, and erred in denying the motion to exclude on the merits, in light of the evidence that petitioner was a 16 year old youth with mental disabilities at the time of the custodial interrogation and that he did not knowingly and voluntarily waive his Miranda rights.

(Pet. at 3.)  Petitioner clarifies that he was "denied a full and fair hearing with respect to establishing the factual basis that he was deceived into speaking with the investigating detective without an attorney" and that, "in any event[,] his will was overborne and the statements were extracted in violation of his privilege against self-incrimination."  (Traverse at 3.)

      The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> [Petitioner] seeks to exclude from evidence his confession to the sheriff's deputy.  He claims the trial court committed prejudicial error by finding he voluntarily, knowingly, and intelligently waived his rights to remain silent and to have an attorney present when he gave his statement to the authorities.  The People reply that because [petitioner] was not in custody for purposes of *Miranda* when he gave his confession, he was not entitled to be advised of his rights under *Miranda*.  [The court] concludes [petitioner] was in custody for purposes of *Miranda*, and he voluntarily and knowingly waived his *Miranda* rights.

> A.  Custodial interrogation

11

[The court] turn[s] first to the People's claim that [petitioner] was not in custody. "Absent 'custodial interrogation,' *Miranda* simply does not come into play." (*People v. Mickey* (1991) 54 Cal.3d 612, 648.) Our Supreme Court recently described how [the court is] to determine whether a defendant is in custody for purposes of *Miranda*:

"The test for whether an individual is in custody is 'objective . . . : "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."'" (*Thompson v. Keohane* (1995) 516 U.S. 99, 112; see also *People v. Stansbury* (1995) 9 Cal.4th 824, 830.)

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The question whether the defendant was in custody for *Miranda* purposes is a mixed question of law and fact. (*Thompson v. Keohane, supra,* 516 U.S. at pp. 112-113.) 'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is . . . reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." [Citations.] The first inquiry, all agree, is distinctly factual . . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination . . . presents a "mixed question of law and fact" . . . .' (*Ibid.*, fn. omitted.) Accordingly, [the court applies] a deferential substantial evidence standard (*People v. Memro* (1995) 11 Cal.4th 786, 826) to the trial court's conclusions regarding '"basic, primary, or historical facts: facts 'in the sense of recital of external events and the credibility of their narrators . . . .'"' (*Thompson v. Keohane, supra,* 516 U.S. at p. 110.) Having determined the propriety of the court's findings under that standard, [the court] independently decide[s] whether 'a reasonable person [would] have felt he or she was not a liberty to terminate the interrogation and leave.' (*Id.* at p. 112.)" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401-402.)

The trial court did not make any findings on the issue of custody. Since *Miranda* does not even come into play unless there was custodial interrogation, and since the trial court decided the issue of waiver on the merits, [the court] necessarily assumes the trial court determined [petitioner] was subject to custodial interrogation. Accordingly, [the court] will accept all facts which support that conclusion and which are supported by substantial evidence as the facts on which the trial court based its decision, and will not engage in resolving conflicting testimony or making determinations of credibility.

The evidence presented at the preliminary hearing demonstrated the following:  Deputy Sheriff Gillum contacted [petitioner] first in response to [petitioner's] 911 call.  He questioned [petitioner] for about 15 minutes until [petitioner] stated the gun was his and that the gun was normally not kept in [petitioner's] room.  At that point, the deputy detained [petitioner] unhandcuffed in the rear seat of his patrol car and drove back to the crime scene.  [Petitioner] testified that Gillum told him he had no choice and had to get into his patrol car.

[Petitioner] was detained in the patrol car for slightly over an hour, during which time he was within the sight of the deputy, who had left the car.  [Petitioner's] mother was not allowed to speak with him while he remained in the car.

This patrol car was designed such that [petitioner] could not get out of the back on his own.  The rear doors opened only from the outside, and a barrier separated the back seat from the front seat.  [Petitioner] remained in the back seat for approximately one hour until he was removed from the car by two detectives.

Before [petitioner] was removed, Detective Clark Fancher came to the patrol car, sat in the front seat, introduced himself and said he wanted to ask [petitioner] a couple of questions.  Fancher asked [petitioner] if his gun was loaded.  [Petitioner] said it was not his gun but was his mother's gun, and that it was kept loaded.  Then Fancher read [petitioner] his rights in the patrol car.  Fancher did not ask [petitioner] at that time if he would give up those rights.  At some point, Fancher told [petitioner] that he wanted to interview [petitioner] downtown at the sheriff's department.

Detective Fancher and his partner, Detective Ronald Garverick, took [petitioner] out of the first patrol car.  Garverick ordered a gunshot residue test on [petitioner].  He heard from someone at the scene that [petitioner] was 16 years old.

Garverick told [petitioner] "we need to talk to you downtown."  He told [petitioner] his partner would take him downtown and he needed to tell "us" the truth.  [Petitioner] responded that he would.  Garverick testified that [petitioner] did not volunteer to go downtown.

There was conflicting testimony about what, if any, conversations happened between [petitioner], his mother and the detectives after [petitioner] was removed from the first patrol car.  During this time, however, the detectives remained at [petitioner's] side.

Fancher directed [petitioner] to get into the front seat of Fancher's unmarked vehicle.  Fancher drove [petitioner] to a point several blocks away where officers administered a gunshot residue test to [petitioner].  [Petitioner] got back into Fancher's vehicle at

Fancher's direction, and Fancher drove him to the sheriff's department.

There, [petitioner] was detained in an interrogation room locked from the outside. Detective Fancher could exit the room only by unlocking the door with his keys. At the beginning of the taped portion of the interview, Fancher read [petitioner] his *Miranda* rights and obtained [petitioner's] waiver to proceed with the interview.

[Petitioner] testified he did not believe he had the option of asking to leave the interrogation room. Although he had not been arrested, he did not know what would happen to him after his interview by Fancher or whether he would leave the sheriff's department that day. There is no evidence in the record showing the detectives informed [petitioner] prior to the interview that he could terminate the interview. During the interview, Fancher did not mention [petitioner's] mother coming to pick him up until the latter part of the interview when he was notified she had arrived. However, Mrs. Spence testified the detectives informed her in [petitioner's] presence that [petitioner] would be interviewed downtown as a witness and she could pick him up after the interview.

Based on the totality of circumstances as just outlined, the trial court correctly found implicitly [petitioner] was in custody for purposes of *Miranda*. On these facts, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Certainly [petitioner] was subject to the restraint on freedom of movement of the degree associated with a formal arrest once he was placed in the back of the patrol car and left there for an hour with no means to exit the vehicle.

While he was not handcuffed or formally arrested once he was removed from the vehicle, his movements and actions were controlled by the detectives. He was subjected to a gunshot residue test, suggesting he was considered a suspect. He was read his *Miranda* rights twice, the second time occurring in a locked interrogation room at the police station, to which he had been taken by the detective. He was personally given no indication what would happen to him after he spoke with the detectives until towards the end of the interview.

Under these circumstances, a reasonable person, and in particular a reasonable 16-year-old, would not have felt free to terminate the interview and leave the station. [Petitioner] was entitled to the rights provided under *Miranda*. (Cf. *People v. Stansbury, supra*, 9 Cal.4th at pp. 831-834 [defendant not in custody when asked to answer questions at police station, offered choice of own transportation there, interview is short and non-accusatory]; *Green v. Superior Court* (1985) 40 Cal.3d 126, 136 [defendant not in

custody where record did not show if defendant realized the police station interview room was locked during interview].)  [The court] now determine[s] whether his waiver of *Miranda* rights was valid.

## B.  Validity of Waiver

"[D]eterminations as to the validity of a waiver of *Miranda* rights–a predominantly legal mixed question–are reviewed independently."  (*People v. Mickey, supra,* 54 Cal.3d at p. 649.)  "[A]pplying the independent review standard, a reviewing court should examine the uncontradicted facts to determine independently whether the trial court's [legal] conclusion . . . was properly found. . . .  In exercising this function the [appellate] court recognizes that the burden is on the prosecution. . . .  If there is conflicting testimony, the [appellate] court must accept that version of events which is most favorable to the People, to the extent supported by the record.  We accept factual inferences in favor of the judgment or order below, even when we must independently review the legal conclusion the trial court has drawn."  (*People v. Stansbury, supra*, 9 Cal.4th at 831, citations and internal quotation marks omitted.)

Whether a waiver of *Miranda* rights is sufficiently knowing and intelligent is "a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.  The state must demonstrate the validity of the defendant's waiver by a preponderance of the evidence."  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1034, citations and internal quotation marks omitted.)  "[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal[s] . . . the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."  (*Moran v. Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 421], internal quotation marks omitted.)

Our standard of review on this issue is not affected by [petitioner's] status as a minor.  "We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so.  The totality approach permits–indeed, it mandates– inquiring into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.  [Citation.]"  (*Fare v. Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 212].)

[Petitioner] was read his *Miranda* rights twice. He testified at the preliminary hearing that he understood those rights on both occasions. He argues, however, he was in effect tricked into signing the waiver because one of the detectives allegedly stated in his presence at the crime scene and prior to the sheriff's department interview that he did not need an attorney. Given his intellectual and emotional states, [petitioner] claims such a statement would have adversely impacted his ability to knowingly waive his *Miranda* rights. [The court] disagree[s].

The evidence of whether one of the detectives stated [petitioner] would not need an attorney is contradicted. Detective Garverick testified that at some point Mrs. Spence asked him if her son needed an attorney. He replied, "I don't believe so, no." Garverick did not know if [petitioner] was present when he made the comment to Mrs. Spence.

[Petitioner] and his mother testified at the preliminary hearing that Detective Fancher, not Detective Garverick, informed [petitioner's] mother that [petitioner] would not need an attorney. They both claimed [petitioner] was standing immediately next to his mother when Fancher made the statement. Fancher, however, testified he did not speak with Mrs. Spence at the crime scene.

Before the trial judge, Mrs. Spence testified she first requested an attorney while speaking with Fancher alone. Then, after the two detectives had taken [petitioner] out of the car, she asked the two detectives for an attorney while [petitioner] was standing next to her. Defense counsel showed to Mrs. Spence a photograph made from a videotape shot by a local television news crew. The photograph depicted herself, her son Justin, the [petitioner], and Detective Garverick. Mrs. Spence testified the video was taken at the time she was asking whether her son needed an attorney. She stated "they" [the detectives] told her "no attorney."

[Petitioner] further claims that during the ride to the sheriff's department, he asked Fancher if Fancher was sure he did not need an attorney. [Petitioner] claims Fancher responded by saying there was no need for an attorney. Fancher, however, claims [petitioner] never asked him about the need for an attorney during the ride downtown.

Thus, there is no uncontradicted evidence showing the comment was made in [petitioner's] presence. In fact, the testimony of the deputies is controlling on appeal, and neither deputy testified they informed [petitioner] he needed an attorney.

Based on his review of police and educational records, psychological tests and an interview with [petitioner], Dr. Eugene Roeder testified he discerned certain psychological factors that limited [petitioner's] ability to make a knowing and intelligent

voluntary waiver but not necessarily factors that precluded his ability to waive.

[Petitioner's] developmental level was not that of a typical 16-year-old. His IQ ranged between 71 and 74, or between the third and fifth percentile. Roeder claimed that range was not considered developmentally disabled or mentally retarded, but was in that range just above that. [Petitioner's] comprehension level was that of a 10-year-old. His ability to attend and concentrate was on level with a six- or eight-year-old.

At a developmental and intellectual level, Roeder testified, [petitioner's] ability to make independent decisions and to understand the facts and consequences of decisions was significantly reduced. [Petitioner] demonstrated comprehension levels of an average 10-year-old. Nevertheless, all other things being ideal, Roeder believed a person with this level of intellectual ability would be able to understand the vocabulary of the *Miranda* warning. In fact, if [petitioner] was given the *Miranda* form he was actually given, and this form was read to him, Roeder stated [petitioner] would have understood it.

On an emotional level, Roeder claimed, [petitioner] had a passive and dependent personality and would tend to have a dependency on authority figures. Roeder believed [petitioner] would be much more likely to accept the detective's statement of not needing an attorney as authority rather than raise an independent objection to that information.

Based on [petitioner's] development level and inability to make independent decisions, Roeder opined a statement by a detective that [petitioner] did not need an attorney would have more impact on someone in [petitioner's] situation than it would on someone in a different set of circumstances.

After the preliminary hearing, [petitioner] underwent additional neuropsychological testing by Dr. Daniel Edwards. Those tests showed [petitioner] was dyslexic. Roeder testified that Edwards's finding was consistent with Roeder's earlier testimony that [petitioner] would rely more on what he hears because he cannot read well. Because [petitioner] had a difficult time understanding things independently, he would tend to be dependent on information from other people. In Roeder's opinion, the additional study strengthened his earlier opinion, but it added nothing new.

Finally, Dr. James Wu, an optometrist, testified that [petitioner] was quite far-sighted with some astigmatism, and was cross-eyed most of the time. Wu stated it would be very difficult for [petitioner] to read the *Miranda* waiver form holding it at a normal distance. It would be possible, but it would require lots of

/////

17

concentration and effort and would take longer than a normal person would take.

After watching the videotape of [petitioner] reading the waiver, Wu testified he did not see [petitioner] making the type of effort to recognize the words in the form [petitioner] would have had to have taken to recognize the words without his glasses. Wu referred to an examination and report dated two days before the date of the preliminary hearing that concluded [petitioner] was unable to read without glasses.

The prosecutor timed how long it took Wu to read the waiver form. Wu read the form in approximately 10 seconds. Wu stated he saw [petitioner] had the waiver in front of him for an extended period of time, but Wu could not opine whether [petitioner] was reading it or not. Wu believed [petitioner] would comply with the detective's directive to sign at a particular place, but with great difficulty.

The videotape shows [petitioner] was not wearing external glasses during the interview. [Petitioner] testified he could not read the waiver when it was presented to him. He claimed he signed the waiver because Fancher told him to sign it. He did not ask Fancher for an attorney because Fancher had already told him and his mother he did not need one. [Petitioner] also testified he "didn't think that [Fancher] was telling me that I couldn't have a lawyer, and I signed the paper." In other words, [petitioner] understood he could have an attorney, but based on Fancher's alleged statements, he believed he did not need one.

We reviewed the videotape recording of the confession and the transcript of that interview. Fancher placed the waiver form on the table in front of [petitioner] and to Fancher's side. Fancher informed [petitioner] he could follow along with Fancher as Fancher read the waiver form. Fancher then showed [petitioner] the questions that followed the rights and asked [petitioner] to initial "at the appropriate box, and then just sign here by the X." He did not direct [petitioner] to answer either question in a particular way.

Fancher then read [petitioner] the rights. [Petitioner] appears in the tape to be following along with Fancher's reading. After reading the rights, Fancher began reading the first question that follows on the form. It appears that while reading the first question, Fancher lost his place. At that point, [petitioner] picked up precisely where Fancher left off and finished reading most of the question out loud. Both Fancher and Spence laughed at this moment. Then Fancher stated, "It's hard reading from the side" while [petitioner] initialed the box saying he understood the rights. Fancher then read the question asking [petitioner] if, understanding these rights, he wished to talk with Fancher now. [Petitioner] again initialed the "yes" box. The interview then proceeded.

This evidence demonstrates [petitioner's] waiver was knowing, intelligent and voluntary. While the evidence may have been contradicted, on appeal, we are required to conclude [petitioner] did not hear any deputy or detective state he did not need an attorney. Even if [petitioner] heard one of the detectives say he did not need an attorney, that statement is not a deception or a false communication. The police are only required to advise persons in custody that they have a right to an attorney. Whether they need one is not a judgment the police are obligated to make.

If the statement was deceptive, we still would reach the same conclusion. "[T]he voluntariness of a suspect's waiver is not called into question when, as in this case, the police use a misrepresentation to lure a suspect into custody, yet reveal the misrepresentation before the suspect makes a statement." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1207.) Here, [petitioner] was informed twice he had the right to an attorney before he made his confession.

Further, there is no evidence in the record suggesting [petitioner] did not understand the *Miranda* rights or the consequence of waiving those rights. [Petitioner] testified he understood them both times he received them. [Petitioner's] own expert testified [petitioner] could understand the words used in reading the *Miranda* rights, despite his low intelligence and developmental level. Finally, [petitioner] himself demonstrated on tape that, the ophthalmologist's testimony notwithstanding, he could in fact easily read the *Miranda* warning.

[The court] conclude[s] the totality of the circumstances demonstrates [petitioner] waived his *Miranda* rights knowingly and voluntarily. The trial court properly denied [petitioner's] motion to suppress his confession.

(Opinion at 26-39.)

Any waiver of the Fifth Amendment right to remain silent must be voluntary as well as knowing and intelligent. Colorado v. Spring, 479 U.S. 564, 572 (1987); Moran v. Burbine, 475 U.S. 412, 421 (1986). The waiver must be both "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and knowing in that it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Spring, 479 U.S. at 573. Only if the "'totality of the circumstances surrounding the interrogation'" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that

the Miranda rights have been waived." Moran, 475 U.S. at 421. See also Juan H. v. Allen, 408 F.3d 1262, 1271 (9th Cir. 2005).

A waiver of one's rights under Miranda "need not be express." United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005). However, there is a "presumption against waiver." Id. In soliciting a waiver of Miranda rights, "police officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or her rights." Id.; United States v. Cazares, 121 F.3d 1241, 1244 (9th Cir.1997). Waiver can be inferred "from the actions and words of the person interrogated." North Carolina v. Butler, 441 U.S. 369, 373 (1979). However, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475.

> A confession must be suppressed, even absent a *Miranda* violation, when the totality of the circumstances demonstrates that the confession was involuntary. *Dickerson v. United States*, 530 U.S. 428, 434 (2000). However, if interrogators obtained a confession after *Miranda* warnings and a valid waiver, the confession was likely voluntary. See *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility."); *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare").

See DeWeaver v. Runnels, ____ F.3d ____, 2009 WL 455497 at *6 (9th Cir. 2009).

i. Right to Full and Fair Hearing

Petitioner first contends his due process rights to a full and fair hearing were violated by the trial court's refusal to hold an evidentiary hearing to establish the factual basis that petitioner was deceived into speaking with the investigating detective.

Respondent argues petitioner was granted all the process he was due because the Miranda claim was heard at the preliminary hearing where five defense witnesses, including

petitioner, testified.  The court also received further briefing on the renewed motion to suppress and, although an evidentiary hearing was not held, the trial court had benefit of the transcript from the preliminary hearing and viewed petitioner's videotaped statement.

The record reflects an extensive preliminary hearing was held before a state court magistrate over the course of three days, at which petitioner was allowed to call five witnesses. (CT 22.)  At the December, 1997 preliminary hearing, the following testimony was given, in pertinent part:

While petitioner was in the back seat of the police car, Detective Fancher read petitioner his <u>Miranda</u> rights.  (CT 285.)  Petitioner testified that Detective Fancher allowed petitioner to get out of the car.  (CT 254.)  At the time petitioner's mother, Mrs. Spence, was asking about the situation, petitioner, Justin, Mrs. Spence and Detective Fancher were present; petitioner did not recall anyone else being present.  (CT 254.)  Petitioner testified he heard his mother ask Detective Fancher if she needed a lawyer and Detective Fancher responded, "no, [he] didn't."  (CT 255.)  Petitioner testified they were there about three minutes.  (CT 256.)

Detective Garverick testified that he specifically recalled that "[a]t some point Mrs. Spence asked him if her son needed an attorney, and he replied 'I don't believe so, no,'" but that Garverick "did not know if [petitioner] was present when he made that comment to Mrs. Spence."  (Clerk's Transcript ("CT") at 115.)  "He might have been, but I can't say for certain." (CT 116.)

Mrs. Spence, however, testified that it was Detective Fancher who told her petitioner did not need an attorney, and this was the second time she had asked whether petitioner needed an attorney.  (CT 227.)

Detective Fancher testified that he was not present when Mrs. Spence asked if her son needed a lawyer and that he did not speak with her at the crime scene.  (CT 127.)  It is undisputed, however, that both detectives remained at petitioner's side the entire time he was outside Deputy Sheriff Gillum's marked police vehicle.  (CT 31-32.)

Petitioner presented a photograph taken from a television crew's video that shows Mrs. Spence, her other son, Justin, petitioner and Detective Garverick standing together. (CT 242-43.) Mrs. Spence testified that this video was taken at the time she was asking whether he son needed an attorney, and Detective Fancher said "no." (CT 228.)[4] Mrs. Spence testified that Detective Garverick was part of the discussion about getting an attorney. (CT 243.) Mrs. Spence testified that Detective Fancher, although not pictured in the photo, was standing across from her at that time. (CT 229, 243.) He was about a foot away from her. (CT 229.) Mrs. Spence confirmed that she, petitioner, Justin, Detective Garverick and Detective Fancher were present at that time. (CT 228.) She testified she was standing right next to petitioner when she asked whether petitioner needed a lawyer. (CT 229.) Mrs. Spence testified she knew this was the moment of the discussion because it was the only time petitioner was outside the law enforcement vehicle. (CT 244.)

Mrs. Spence also testified that Detective Fancher told her that petitioner was a witness. (CT 241.)

Justin testified that he recalled his mother asking whether they should get a lawyer. (CT 248.) He recalled that petitioner was right by her side when she asked and that Justin was on the other side, but he did not recall what officers were present or at what time this took place. (CT 248-49.)

Petitioner also testified that on the way downtown, petitioner asked Detective Fancher if he was sure petitioner did not need a lawyer and the detective told him there was no need for a lawyer. (CT 259.) However, detective Fancher testified that petitioner did not ask him if petitioner needed an attorney during the drive to the station downtown. (CT 129-30.)

The state court magistrate reviewed the totality of the circumstances and determined that petitioner was not in custody for <u>Miranda</u> purposes. (CT 321-22.) However, the

_____

[4] Mrs. Spence also testified this was the second time she had asked Detective Fancher whether she needed to get a lawyer. <u>Id.</u>

court went on to evaluate "whether or not the waiver which was given by [petitioner] was a knowing, intelligent and voluntary waiver." (CT 322.) The magistrate then stated:

> I think that in analyzing, that one of the things that the Court must look at is this conversation that took place that – obviously Miss Barbara Spence has one memory of it; [petitioner] has another memory. And there are at least two officers that have different memories of what did or did not take place.
>
> It would appear to the Court that Barbara Spence, at least at some point in time, made an inquiry in which Ron Garverick was present whether or not [petitioner] needed a lawyer. It appears to the Court that the response was equivocal; that is, Garverick said, "I don't think so," but there was no real affirmative statement of, "Yes," or, "No."
>
> Assuming that [petitioner] was there, it certainly put, one, into issue the aspect that this was a concern that his mother had as to whether or not he needed an attorney or didn't need an attorney, and that was – that puts that in position number one, or point number one.

(CT 322.) The magistrate then turned to review of the videotaped statement. He focused on where the officer began reading a line, paused, and petitioner jumped in and said "Each of these rights explained to you." (CT 323.) The magistrate found petitioner read the remainder of that warning and that petitioner's concentration on the paper following the officer's question, "Having these rights in mind do you wish to talk to me now?" raised an inference that petitioner was also reading that line. (CT 323.) Emphasis was placed on petitioner's checking off the appropriate boxes and signing without any additional instruction or further prompting by the officer. (CT 323.) Petitioner "had a greater ability to read and comprehend than perhaps his testimony would lead us to believe, at least what he said he could, or the expert opinion as to what he could read." (CT 324.)

The magistrate noted that petitioner's expert testified petitioner had the ability to understand the vocabulary and found "[i]t does appear to the Court at least he understood the words, understood the vocabulary, to the point that he knew what they meant." (CT 324.)

/////

The magistrate confirmed there "was concern as to whether or not [petitioner] should have a lawyer voiced by his mother. [Petitioner] said he was present when this took place." (Id.) Petitioner also testified he did not know whether he was just a witness or a suspect. (CT 324-25.)

The magistrate found that during petitioner's statement he appeared to be avoiding the mention of a weapon in the robbery plan, which raised an inference that petitioner was "trying to basically not incriminate himself by not speaking about that aspect of it." (CT 325.) The magistrate analyzed whether or not petitioner understood the Miranda warnings and found it appeared petitioner did understand them and made the waiver knowingly, intelligently and voluntarily. (CT 325-26.)

On April 15, 1998, defense counsel filed a motion to disallow admissions of defendant, seeking to suppress all admissions and confessions taken by Detective Fancher on April 18, 1997. (CT 361-73.) On April 27, 1998, the prosecution filed written opposition. (CT 427) On April 27, 1998, the trial court agreed to review Dr. Edwards' report. (Reporter's Transcript at 28.) Defense counsel filed supplemental briefing on May 4, 1998. (CT 487-92).

On May 5, 1998, outside the presence of the jury, the trial court heard further testimony from Mrs. Spence. (RT 105-10.) She requested an attorney from Detective Fancher. (RT 105-11.) On cross-examination she clarified that she asked whether she needed an attorney, but could not recall her precise words. (RT 105-19.) The second time she requested an attorney[5] was when petitioner had been removed from the police car. Petitioner was standing with her and both detectives were present. (RT 105-12.) Her request was made to both detectives. (RT 105-12.) The photo of her, Justin and Detective Garverick was an accurate depiction and was taken at

_____

[5] On re-cross examination, Mrs. Spence was asked "[w]hen you say you requested an attorney, does that mean that you asked that they get an attorney for your son, is that what you did?" A. "No, Ma'am." Q. "So you did not request an attorney, did you? A. "Yes, I did." Q. You did not request that they get an attorney for your son, did you?" A. "I didn't request they get an attorney." (RT 105-22.)

the time she was asking them whether petitioner needed an attorney. (RT 105-13; 105-24.)
"They told me, no attorney." (Id.) She estimated they were standing there talking for five to ten
minutes. (RT 105-24.)

She asked to be present while petitioner was questioned and explained why she
wanted to be present, but the detectives told her "no, absolutely not." (RT 105-14; 105-21.) The
detectives told her she could pick up her son in about two hours downtown after he gave his
statement. (RT 105-15.)

Mrs. Spence did not know whether petitioner heard her ask whether petitioner
needed an attorney. (RT 105-20.) On redirect examination, Mrs. Spence confirmed that when
she was standing next to petitioner and the detectives, the distance was about shoulder to
shoulder. (RT 105-20.)

The trial court then asked Mrs. Spence:

> THE COURT: When you think you are -- to the best of your
> recollection, asked, Does he need an attorney, what was the
> demeanor of your boy at that time. . . . Was he crying?

> THE WITNESS: He wasn't crying. He was very distant. He
> didn't – appearance-wise, didn't look like – I mean, he looked
> distraught to me, incoherent, like he wasn't understanding anything
> that was going on. He was just there.

(RT 105-23 - 105-24.)

In the afternoon of May 5, 1998, Dr. Eugene P. Roeder was called to the stand
and testified that since his testimony at the preliminary hearing, he requested petitioner undergo a
neuropsychological evaluation by Dr. Daniel Edwards. (RT 107, 108-09.) "What Dr. Edwards'
testing has identified is that it's very likely that those IQ limitations are related to some kind of
generalized brain dysfunction." (RT 111.) Dr. Roeder confirmed that petitioner is dyslexic and
that would "primarily affect his ability to read, so he would tend to rely more on what he would
hear than what he would read." (RT 113.) "Dr. Edwards' testing has identified . . . that
[petitioner] has a difficult time understanding things independently, and so, that reinforces the

opinion that he would tend to be, as the word, dependent on information from other people."

(RT 113.)  At bottom, Dr. Roeder confirmed that Dr. Edwards' report strengthened Dr. Roeder's

earlier findings but did not substantially change them.  (RT 114-15.)

On May 6, 1998, the trial court denied the renewed motion:

> [Petitioner] previously litigated this issue during his preliminary hearing.  Judge Michael Garcia declined to find a <u>Miranda</u> violation, and determined that his statements were voluntary.

> The Court again denies [petitioner's] motion.  There is no evidence that he requested an attorney after being informed of his <u>Miranda</u> rights.  The Court has examined the videotape of the interview, heard testimony from Barbara Spence and Dr. Eugene Roeder, and independently reviewed the record of the evidentiary hearing on this issue before Judge Garcia.  It finds that there was no violation of his <u>Miranda</u> rights and that he voluntarily waived his right to remain silent.

> [Petitioner] states that newly discovered evidence of brain damage establishes that he was unable to voluntarily consent to being interviewed in the absence of his attorney.  But, he has not presented any expert evidence to support his claim that his neurological problems impaired his ability to voluntarily agree to waive his right to an attorney.  Furthermore, an examination of the videotape of his interview reveals that he was sufficiently coherent to understand his <u>Miranda</u> rights when informed of them, and thereafter knowingly and voluntarily waived them.

(CT 496-97.)

A trial court judge has wide discretion in deciding whether to reconsider a

suppression motion.  Cf. <u>United States v. Rabb</u>, 752 F.2d 1320, 1322 (9th Cir.1984), <u>cert. denied</u>,

471 U.S. 1019 (1985) (reviewing district court's decision to reconsider a suppression motion for

abuse of discretion).  It is undisputed that the trial judge had benefit of the transcript from the

preliminary hearing at which petitioner was allowed to present testimony from five defense

witnesses, including petitioner.  The trial court allowed petitioner to recall Mrs. Spence and Dr.

Roeder to the stand, and the trial court reviewed Dr. Edwards' report.

Section 2254(d) does not empower this court to redetermine the credibility of

witnesses whose demeanor has been observed by the state trial judge.  <u>Marshall v. Lonberger</u>,

459 U.S. 422, 434 (1983).  Because petitioner had ample opportunity to be heard on his <u>Miranda</u> claim, including whether or not he was deceived by the detective's alleged advice that he did not need a lawyer, another evidentiary hearing was not required.

The state court properly analyzed this claim under controlling principles of United States Supreme Court precedent, citing <u>Jackson v. Denno</u>, 378 U.S. 368 (1964) and <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986).  (Opinion at 16.)  The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent.

ii.  Unreasonable Determination of the Facts

Petitioner next argues that the state Court of Appeal unreasonably found that "there is no uncontradicted evidence showing the comment was made in [petitioner's] presence," and that "the testimony of the deputies is controlling on appeal, and neither deputy testified they informed [petitioner] he needed an attorney."  (Opinion at 35.)  Petitioner contends this analysis reflects that the state court "got the issue backward," because the issue here is whether one or both of the detectives told petitioner he did not need an attorney and whether that advice deterred petitioner from asking for an attorney when he was Mirandized.

The Ninth Circuit has held that the "unreasonable determination" standard of § 2254(d)(2) applies to challenges to state-court findings, such as challenges to the state court's findings based entirely on the state record, or claims that the process employed by the state court was defective.  <u>Taylor v. Maddox</u>, 366 F.3d 992, 999–1001 (9th Cir. 2004)(where no reasonable appellate court would ignore the testimony of a witness that corroborated the petitioner's version of challenged events, the state court's findings would be set aside as unreasonable); <u>see also</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 972 (9th Cir. 2004).  Challenges to state court findings under the "unreasonable determination" standard may arise where the finding is not supported by sufficient evidence, the state court should have made a finding of fact but neglected to do so, the

/////

state court made a finding of fact under a misapprehension of the correct legal standard, or the fact-finding process itself was defective. Maddox, 366 F.3d at 999, 1000–1001.

The Maddox court cautioned that "before [the court] can determine that the state court fact-finding process is defective in some material way . . ., [the court] must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the . . . fact-finding process was adequate." Id., 366 F.3d at 1000; 1005-07; Derrick v. Peterson, 924 F.2d 813, 823 (9th Cir. 1990) (pre-AEDPA case; waiver of Miranda rights a question of fact).

When a federal court determines that state-court fact-finding was unreasonable on federal habeas review, the federal court has an obligation to set those findings aside and, if necessary, make new findings. 28 U.S.C. § 2254(d)(2), (e)(1). A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision "so inadequately supported by the record" as to be arbitrary and therefore objectively unreasonable. Ward v. Sternes, 334 F.3d 696, 704 (7th Cir. 2003); see also Rolan v. Vaughn, 445 F.3d 671, 683 (3d Cir. 2006) (state court's rejection of Strickland claim was objectively unreasonable in light of its "unreasonable determination" of central factual finding underlying its decision). The presumption of correctness will not attach where the state court factual finding is unsupported by sufficient evidence. Canaan v. McBride, 395 F.3d 376, 383 (7th Cir. 2005) (state court's finding that counsel advised petitioner of his right to testify was unreasonable as the finding was "flatly contradicted" by testimony of counsel).

As noted above, the state appellate court decided there was no uncontradicted evidence demonstrating the detective's answer was given in petitioner's presence, held the testimony of the deputies was controlling on appeal, and stated that neither deputy testified they informed petitioner he needed an attorney. (Opinion at 35.)

Petitioner contends that the "only rational conclusion from the factual record is that Garverick's statement that petitioner did not need an attorney was made in [petitioner's] presence." (Traverse at 6.)

This court has reviewed the record and does not find that the state court's factual findings were arbitrary or unreasonable. Therefore, the factual findings are entitled to a presumption of correctness, and, considering the totality of the circumstances, the trial court properly refused to suppress the evidence of petitioner's videotaped statements to the detective.

### iii. Were Petitioner's Statements Voluntary?

Even assuming, *arguendo*, a detective advised Mrs. Spence, in petitioner's presence, that no attorney was needed, the court is still required to analyze whether such a statement was coercive or rendered petitioner's subsequent statement involuntary in order to determine whether petitioner is entitled to habeas relief. Thus, in the interest of justice and judicial economy, <u>Maddox</u>, 366 F.3d at 1008-09, this court will assume that the detective made the statement in petitioner's presence, and analyze the remainder of petitioner's claim.

Petitioner argues that the detective's statement that petitioner did not need an attorney rendered the subsequent <u>Miranda</u> warning ineffective, resulting in an involuntary statement by petitioner.

As noted above, a confession which is the result of coercive government conduct is involuntary and may not be used against a criminal defendant. Promises of leniency can render a confession involuntary, as such tactics can overcome a defendant's free will. <u>Colorado v. Spring</u>, 479 U.S. at 574.[6] However, the Supreme Court in <u>Colorado v. Connelly</u>, 479 U.S. 157, 107 S.Ct. 515 (1986), stated that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fifth Amendment." <u>Id.</u> at 167, 107 S.Ct. 515. "Only confessions procured by *coercive official tactics* should be excluded as involuntary." <u>Id.</u> "'Free choice' is no longer a touchstone; indeed, the

---

[6] The <u>Spring</u> court held that the suspect's awareness of all the crimes about which he could be questioned was not relevant to determining the validity of the decision to waive the Fifth Amendment privilege against self-incrimination and, therefore, the failure to inform the defendant of the subject matter of an interrogation could not have affected his decision to waive the privilege. <u>Id.</u>

Supreme Court has ruled in *Connelly* that a volunteered confession was admissible even if the product of a psychosis that undermined the suspect's ability to make a free and rational choice." United States v. Byram, 145 F.3d 405 (1st Cir. 1998).

Petitioner's argument that the police detective's statement induced petitioner into making a statement is unavailing. First, petitioner was given his Miranda warning before he was removed from Officer Gillum's police car (CT 287), which was before the discussion his mother had with the detectives concerning whether or not petitioner needed a lawyer. Petitioner has failed to address the impact of the initial Miranda warning.

Second, as noted by the trial judge, the police detective's reply, "I don't think so, no," was an equivocal one, not an affirmative statement that petitioner did not need a lawyer. (CT 322.) The comment was that detective's opinion and did not require Mrs. Spence to follow the detective's advice. In addition, the statement was made by the detective to petitioner's mother, not directly to petitioner.

Third, there was no evidence that either detective used the statement to trick or deceive petitioner into speaking with them. There was no evidence that the detectives attempted to question petitioner immediately after the detective told Mrs. Spence that he did not think petitioner needed an attorney. Petitioner has pointed to no evidence in the record that suggests the detectives were deliberately and intentionally misleading petitioner in an effort to get him to make a statement. Moreover, once detective Fancher again advised petitioner of his Miranda rights, petitioner did not protest that he had been told he didn't need an attorney.

This court has viewed the videotaped confession and found nothing coercive about the manner in which the detective informed petitioner a second time of his Miranda rights, or when the detective questioned him about the circumstances surrounding the commitment offenses. Petitioner appeared to be cooperating voluntarily during the confession; indeed, at one point, petitioner chimed in with part of the Miranda warning and both petitioner and the detective
/////

laughed.  (CT 323.)  At no time did petitioner indicate in any manner that he wanted questioning to cease.

Petitioner's argument that petitioner's youth and mental disabilities demonstrated petitioner's statement was involuntary also fails.  The record reflects that petitioner testified he understood the <u>Miranda</u> rights both times he received them.  (CT 281; 287-88.)  Petitioner's own expert testified that despite his low intelligence and developmental level, petitioner could understand the words used in reading the <u>Miranda</u> rights.  (CT 171.)  Finally, the videotape demonstrates petitioner followed along with the reading of the <u>Miranda</u> rights from the form, even finishing the wording at one point.  Petitioner readily marked each item.

For all of the above reasons, this court finds that petitioner's statements to the detective were voluntary.  The state court's rejection of petitioner's first claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent.  Petitioner's first claim for relief should be denied.

B.  <u>Second & Third Claims</u>

Petitioner's second and third claims are that there was insufficient evidence of first degree murder and insufficient evidence of special circumstances.  The court will first set forth the standards for evaluating the claims, then analyze each claim below.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  <u>See</u> <u>also</u> <u>Prantil v. California</u>, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  "[T]he dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir. 2004) (quoting <u>Jackson</u>,

443 U.S. at 318).  A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.  Juan H. v. Allen, 408 F.3d at 1275.

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." United States v. Dinkane, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)).  "The question is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines the sufficiency of the evidence by reference to the substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

a. Second Claim:  Insufficient Evidence of First Degree Murder

Petitioner contends there was insufficient evidence of first degree murder because the prosecution's evidence shows that petitioner was not the actual killer and that he had withdrawn from any alleged agreement to rob the victim at the time that codefendant Smithson shot the victim.

The last reasoned rejection of the second claim is the decision of the California

Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court

rejected petitioner's second claim as follows:

> [Petitioner] claims the evidence shows the victim was killed
> accidentally.  As just explained above, even if the victim was killed
> accidentally, that fact would be irrelevant for purposes of liability
> under the felony-murder rule.
>
> [Petitioner] also argues there was no evidence that Smithson killed
> the victim in furtherance of the common design to rob him.  To the
> contrary, [petitioner's] confession provides overwhelming
> evidence that both [petitioner] and Smithson intended to rob the
> victim.  In fact, the ultimate plan relied upon was put forth by
> [petitioner].  He also provided the loaded handgun to be used by
> Smithson to force the victim to turn over his money.  Even after he
> decided not to be present during the actual robbery, [petitioner]
> still provided the gun to Smithson.  He also continued to intend to
> share in the proceeds of the robbery.  This is substantial evidence
> on which a trier of fact could find a common design to rob the
> victim.

(Opinion at 45.)

The elements of the crime of felony murder are:  (1) a human being was killed; (2)

the killing was unlawful; and (3) the killing occurred during the commission or attempted

commission of robbery.  (CT 607.)  The specific intent to commit robbery and the commission or

attempted commission of such crime must be proved beyond a reasonable doubt.  (CT 608.)

A killing committed during the commission or attempted commission of a robbery is murder of

the first degree.  (Cal. Penal Code, § 189.)

> The mental state required is simply the specific intent to commit
> the underlying felony; neither intent to kill, deliberation,
> premeditation, nor malice aforethought is needed. [Citations.]
> There is no requirement of a strict 'causal' [citation] or 'temporal
> [citation] relationship between the 'felony' and the 'murder.'  All
> that is demanded is that the two 'are parts of one continuous
> transaction.' [Citation.]  There is, however, a requirement of proof
> beyond a reasonable doubt of the underlying felony.

People v. Berryman, 6 Cal.4th 1048, 1085, 25 Cal.Rptr.2d 867 (1993), overruled on other

grounds, People v. Hill, 17 Cal.4th 800, 823 n.1, 72 Cal.Rptr.2d 656 (1998).  Under California's

felony murder rule, when a defendant aids and abets a robbery, and someone is killed during the robbery, the defendant is guilty of both robbery and murder, even if his accomplice does the killing.  Id.

It is clear that there was sufficient evidence presented at petitioner's trial from which a reasonable trier of fact could have found beyond a reasonable doubt that petitioner was guilty of first degree murder under a theory of felony murder based on the commission of a robbery or attempted robbery.  Petitioner contends there is no evidence in the record to explain why Smithson killed the victim and that imposing vicarious liability on petitioner for this murder misapplies the felony murder rule, citing People v. Pulido, 15 Cal.4th 713, 722 n.2 (1997)(aiding and abetting a robbery after the killing of a victim does not constitute felony-murder under California law).  Petitioner's arguments are unavailing.  The facts of this case do not present the "mere coincidence of time and place" situation discussed in Pulido.  Rather, the instant case demonstrates that courts apply the felony murder rule to

> to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony.

People v. Cavitt, 33 Cal.4th 187, 197, 14 Cal. Rptr.3d 281 (2004).[7]

For the reasons described above, the state court's conclusion that sufficient evidence supported petitioner's conviction of first degree murder based on a felony murder theory is not "objectively unreasonable."  Woodford v. Visciotti, 537 U.S. 19, 25 (2002).  See also 28 U.S.C. § 2254(d)(1).  Accordingly, petitioner is not entitled to habeas relief on this claim.

---

[7] "Under the felony-murder doctrine, a killing, whether intentional or unintentional, is first degree murder if committed in the perpetration of, or the attempt to perpetrate, certain serious felonies.  These felonies include arson, rape, robbery, burglary, mayhem, torture, lewd act with a child, kidnaping, train wrecking, sodomy, oral copulation, penetration by a foreign object, and carjacking.  (P.C. 189; see generally People v. Coefield (1951) 37 C.2d 865, 868, 236 P.2d 570 [under felony-murder doctrine only killing, not murder, must be shown]. . . ."  1 Wit.Crim. Ch. IV, § 134.

b.  Third Claim:  Insufficient Evidence of Special Circumstances

Petitioner argues that there was insufficient evidence of special circumstances because the prosecution failed to present sufficient evidence that petitioner had the mental state of reckless disregard for human life at the time that codefendant Smithson shot and killed the victim.

The last reasoned rejection of the third claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed petitioner's third claim as follows:

> [Petitioner] next argues there was insufficient evidence to support the finding of a special circumstance that the victim was murdered while [petitioner] was engaged in the commission or attempted commission of a robbery.  (§ 190.2, subd. (a)(17).)  [Petitioner] raises two issues:  first, he claims the evidence fails to show the victim was killed in order to advance an independent felonious purpose; second, he claims the evidence fails to show [petitioner] acted with reckless indifference to human life while acting as a major participant in the robbery.  [The court] disagree[s] with both of these contentions.
>
> Regarding the independent felonious purpose, a "robbery-murder special circumstance may only be found true if the murder was committed while the defendant was engaged in 'the commission of, or the attempted commission of' a robbery.  (§ 190.2, subd. (a)(17)(A).)"  (*People v. Marshall* (1997) 15 Cal.4th 1, 40-41.)
>
> As already shown above, substantial evidence exists on which a trier of fact could find that the victim was killed while [petitioner] was engaged in the commission of a robbery.
>
> On the issue of reckless indifference, to find the existence of a special circumstance for one who aided the commission of a felony, the evidence had to establish that [petitioner], "who, with reckless indifference to human life and as a major participant," aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the robbery.  (§ 190.2, subd. (c).)  "Reckless indifference to human life" refers to a mental state in which "the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death.'  ([*Tison v. Estrada* (1987)] 481 U.S. 137, 157 []) . . . ."  (*People v. Estrada* (1995) 11 Cal.4th 568, 577.)  It is a "'subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.'"  (*People v. Proby* (1998) 60 Cal.App.4th 922, 928, quoting *People v. Estrada, supra*, 11 Cal.4th at p. 578.)

35

1    Substantial evidence supports the jury's finding that [petitioner]
     acted as a major participant and with reckless indifference to
2    human life while engaged in the robbery. [Petitioner] developed
     the plan for how the victim would be robbed. He supplied the gun
3    to Smithson to use in the robbery, and he left the room so that
     Smithson and the victim would be alone when the force would be
4    applied to the victim. Most importantly, [petitioner] knew the gun
     he provided Smithson was loaded, and knew Smithson intended to
5    rob the victim by pointing the loaded gun at him and demanding
     his money. This evidence is sufficient to find [petitioner] acted as
6    a major participant with reckless indifference to human life.

7    (Opinion at 45-47.)

8           The special circumstance imposed here required the jury to consider the

9    following:

10          If you find that a defendant was not the actual killer of a human
            being, or if you are unable to decide whether the defendant was the
11          actual killer or an aider and abettor, you cannot find the special
            circumstance to be true unless you are satisfied beyond a
12          reasonable doubt that such defendant with reckless indifference to
            human life and as a major participant, assisted in the commission
13          of the crime of robbery which resulted in the death of a human
            being.

14
            A defendant acts with reckless indifference to human life when
15          that defendant knows or is aware that his acts involve a grave risk
            of death to an innocent human being.

16

17   (CT 617; See also CALJIC No. 8.80.1.)  In order to find the special circumstance, that the murder

18   in the commission of robbery, is true, the jury was required to find the prosecution had proved:

19   (1) the murder was committed while petitioner was engaged in or was an accomplice in the

20   commission or attempted commission of a robbery; and (2) the murder was committed in order

21   to carry out or advance the commission of the crime of robbery.  In other words, the special

22   circumstance referred to is not established if the robbery or attempted robbery was merely

23   incidental to the commission of the murder.  (CT 619.)  In order to find petitioner guilty of the

24   special circumstance, the jury's decision must be unanimous.  (CT 618.)

25          There was substantial evidence that petitioner participated in the plan to rob the

26   victim and acted with reckless indifference to human life.  Petitioner suggested the use of the gun

                                              36

and then broke into his mother's room to obtain the gun.  Petitioner was aware the gun was

loaded and knew Smithson intended to use the gun to rob the victim.  Petitioner then gave

Smithson the gun, even after allegedly withdrawing from the plan to rob the victim.  This

evidence is more than sufficient to find petitioner participated in or, at a minimum, aided

Smithson in the commission of the robbery or attempted robbery, and his actions in obtaining

and turning over the loaded weapon constituted reckless indifference to human life.

The state court's rejection of petitioner's third claim for relief was neither contrary

to, nor an unreasonable application of, controlling principles of United States Supreme Court

precedent.  Petitioner's third claim for relief should be denied.

C.  <u>Fourth Claim</u>

Petitioner's fourth claim is that he suffered ineffective assistance of counsel by

counsel's failure to investigate and present evidence of petitioner's strongest if not only defense,

i.e. that his discussions with Smithson about a robbery, and giving Smithson a gun under duress,

amounted only to mere preparation, not aiding and abetting.

The last reasoned rejection of this claim is the decision of the Sacramento County

Superior Court on habeas review.  (Answer, Ex. C.)  The state court addressed this claim as

follows:

> Petitioner [claims] . . . trial counsel was ineffective in failing to
> present and argue a defense to the felony-murder charge, that his
> conduct preceding the homicide was no more than mere
> preparation for a robbery and did not amount to attempted robbery.
> Petitioner claims that he had effectively abandoned the robbery
> enterprise before the robbery took place, and had not done any act
> to attempt the robbery but had merely done preparatory acts not
> amounting to attempt.
>
> Petitioner's claim could be viewed as being based in actual
> innocence, that as a matter of law he could not be guilty of
> attempted robbery because he had done only a preparatory act.
> Petitioner, however, fails to show that this is so.  Petitioner admits
> that he and his codefendant had planned to commit the robbery,
> that the victim had arrived and was in the next room, and that
> petitioner told his codefendant that he no longer wanted to commit
> the robbery but then, in the next instant, gave a gun to the

codefendant knowing full well that the codefendant's next move would be to commit the planned robbery as soon as the victim walked into the room, and indeed as soon as petitioner left the room to go into the bathroom while the robbery would take place, the victim walked into the room and the codefendant attempted to commit the planned robbery, resulting in the shooting and killing of the victim. In these circumstances, whatever withdrawal petitioner purported to make from the robbery was eviscerated by his then supplying his codefendant with the very gun that he knew would be used in the robbery. That act constituted the aiding and abetting of the attempted robbery, and it was the codefendant's act thereafter, which petitioner aided and abetted, in pointing the gun at the victim to attempt the robbery that constituted the attempt itself. As such, he did not abandon his aiding and abetting the attempted robbery, by his act of giving the gun, and he was liable as an aider and abettor for the attempted robbery that next took place, during which the victim was killed, constituting felony-murder. Petitioner misses the point that under aider and abettor liability, it was the codefendant's act that constituted the attempt for which petitioner was liable, and petitioner was liable because he supplied the codefendant with the gun immediately before the attempted robbery took place. It is irrelevant whether the giving of the gun was "preparatory" or not, under these circumstances.

Petitioner attempts to equate the above with conspiracy, and claims that petitioner withdrew from the conspiracy well before the attempted robbery took place. Not so. Petitioner never withdrew from the conspiracy – he announced he did not want to go through with it, then in the next moment supplied his partner with the gun. That is not a withdrawal from a conspiracy. It is, indeed, commission of the overt act needed for the conspiracy.

Petitioner also claims that his own recently administered polygraph test would confirm that he categorically withdrew from the conspiracy and that he never received any proceeds from the robbery. Petitioner fails to observe, however, that even if this were relevant, which it is not, this self-serving type of unreliable hearsay statement would be inadmissible in any event without stipulation from the prosecution, under Evid. Code § 351.1 (see also People v. Morris (1991) 53 Cal.3d 152, 193 [polygraph evidence is unreliable]).

Petitioner also claims that a declaration from a physician who examined petitioner before trial confirms that petitioner's description of his participation in the offense was consistent with mere preparation rather than an actual attempt. Again, petitioner misses the point, that his codefendant committed the attempt and petitioner actively aided and abetted the attempted robbery by giving the codefendant the gun. The declaration is irrelevant.

/////

> Petitioner simply fails to state any plausible prima facie case for relief on this claim (<u>In re Bower</u> (1985) 38 Cal.3d 865), thereby failing also to set forth an exception to the <u>Clark</u> bar of the claim. The first claim, therefore, is denied.

<u>In the Matter of the Petition of Charles Frank Spence</u>, Case No. 01F08388, November 13, 2001 (Answer, Ex. C at 1-2)(Emphasis omitted).

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. <u>Id.</u> at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. <u>Id.</u> at 690; <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> <u>See also</u> <u>Williams</u>, 529 U.S. at 391-92; <u>Laboa v. Calderon</u>, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 697). This assessment will depend in large part on a determination of whether the evidence likely would have changed the outcome of the trial. <u>Hill v. Lockhart</u>, 474 U.S. 52, 56-57 (1985); see, e.g., <u>Lambert v. Blodgett</u>, 393 F.3d 943, 983 (9th Cir.2004) (finding no prejudice from

counsel's alleged failure to investigate defense of fetal alcohol syndrome where there was little chance such defense would have succeeded).

A difference of opinion as to trial tactics does not constitute denial of effective assistance, see United States v. Mayo, 646 F .2d 369, 375 (9th Cir.1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir.1984). Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. See Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689. The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. See Siripongs, 133 F.3d at 736; Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

Here, petitioner points to the following documents in support of this claim, all of which were presented to the California Supreme Court by way of habeas petition. (Resp't's Answer, Ex. E.)

1. A declaration from petitioner's present attorney confirming that defense counsel did not consider or investigate a possible defense based on mere preparation. (Id., Attachment D.)

2. Letter from W. Michael Floyd, Advanced Polygraph Services, and accompanying polygraph results, that allegedly demonstrate petitioner was honest when claiming he told Smithson he did not want to have anything to do with the robbery, that he told Smithson he was not participating in the robbery, he did not receive any part of the money stolen from the victim and does not know for sure what happened to the victim's money. (Id., Attachment E.)

40

3. Declaration of Dr. Roeder claiming if he had been permitted, he

would have testified that in [his] clinical interview with [petitioner], he acknowledged being asleep on the afternoon of April 18, 1997, after having been up all of the previous night, and was awakened by Smithson who asked if he wanted to "come up on some money." They talked for a while and agreed to rob [the victim]. However, after [the victim] actually arrived at [petitioner's] house, [petitioner] told Smithson that he did not want to do it. Smithson said that he was going to do it anyway. [Dr. Roeder] asked petitioner what he was thinking at that time, and [petitioner's] response was that he did not want anybody to get hurt. [Petitioner] also stated that he was somewhat confused and "foggy" by the aftereffects of the drugs he had been taking when he initially agreed to participate with Smithson. After he told Smithson that he did not want to be involved, he left that part of the house and went to and was in a bathroom when the actual shooting occurred. He explained that he did not try harder to deter Smithson from completing the robbery as he had mental pictures of [the victim] lying in a ditch seriously injured after getting beaten up by Smithson. [Petitioner] said that he had obtained his mother's gun and gave it to Smithson to avoid Smithson's actually injuring [the victim]. [Petitioner] said that the thought of the gun going off or [the victim] being shot never crossed his mind. [Petitioner] described Smithson as somebody who was older and more experienced and who could talk him into doing things.

(Id., Attachment F.)

4. Declaration of petitioner, dated September 2, 2001, in which petitioner sets forth the testimony he would have given had his attorney allowed him to take the stand in his own defense. (Id., Attachment G.)

Petitioner contends defense counsel presented a non-viable defense,[8] failed to investigate, identify or present the strongest defense available to petitioner, and conceded that petitioner aided and abetted Smithson in the robbery, practically assuring a felony murder conviction. (Traverse at 13.) Petitioner argues that defense counsel "should have investigated

/////

---

[8] Defense counsel pursued an alternative theory of defense: because petitioner was intoxicated and had mental deficiencies, petitioner did not formulate the specific intent to commit robbery, and, in any case, petitioner withdrew from the attempted robbery prior to its completion.

and presented a defense that petitioner never engaged in more than mere preparation for a robbery, and so aiding and abetting liability never attached." (Id.)

Petitioner argues that "[a]t the time petitioner communicated to Smithson that he did not want to go through with the robbery, their conduct had not developed into a culpable attempt (Traverse at 18), and that trial counsel

> could have argued that petitioner's repudiation of the robbery at that nascent point terminated any potential criminal liability that may have been developing. Then, when Smithson demanded the gun and petitioner gave it to him out of fear of what Smithson might do otherwise, petitioner had no specific intent to facilitate Smithson's robbery, but was rather trying to minimize the potential harm from Smithson's conduct.

(Traverse at 18-19.)

First, references to the results of a polygraph examination, an offer to take a polygraph examination, or refusal to take such a test are disfavored and constitute inadmissible evidence in a criminal proceeding, absent a stipulation by counsel. Cal. Evid. Code Section 351.1; United States v. Lopez, 885 F.2d 1428, 1437-38 (9th Cir. 1989), cert. denied, 493 U.S. 1032 (1990).

Second, once the trial court decided that petitioner's statement was not to be suppressed, defense counsel was faced with a difficult case. Petitioner's own statements strengthened the prosecution's case against him. Petitioner's admissions also hamstrung defense counsel's ability to fashion a winning defense strategy.

Finally, this court cannot find petitioner sustained prejudice. Defense counsel was laboring in a case where petitioner told police he came up with the plan to use a gun, broke into his mother's room to get the gun, knew the gun was loaded and, despite his protestation that he had changed his mind and decided not to go through with the robbery, thereafter turned over the gun to Smithson while the victim was bringing his bike inside petitioner's home. Petitioner also admitted that even though he allegedly withdrew from the plan, he intended to benefit from the proceeds Smithson would steal from the victim.

1    Equally damning is the jury's verdict that petitioner actually robbed the victim.

2 Because the jury found that petitioner had robbed the victim, petitioner cannot demonstrate that a

3 defense of mere preparation would have changed the outcome of this case. No money was ever

4 found in the home where the crime took place. Smithson, petitioner's co-defendant and the

5 shooter, was searched and found not to have the money on his person. Smithson was convicted

6 of attempted robbery (in addition to murder). Petitioner was the only person present during the

7 murder who left the scene after the murder and before the police arrived. In light of these facts, it

8 would be difficult to conclude that a defense of mere preparation would have changed the

9 outcome here.

10    Petitioner has the burden of establishing a reasonable probability that he would

11 have received a more favorable outcome but for trial counsel's failure to investigate this defense.

12 See Young v. Runnels, 435 F.3d 1038, 1043-44 (9th Cir. 2006). If petitioner had testified to

13 clarify his reasons for turning over the weapon to Smithson, he would have been impeached by

14 his prior admissions to the police. Petitioner's statement that he believed the victim was less at

15 risk because Smithson used a gun because it saved the victim from being physically beaten up by

16 Smithson is not rational or persuasive. While petitioner may have attempted to explain away his

17 overt acts in this case, it is unlikely such explanation would have changed the outcome.

18    Accordingly, the state court's rejection of petitioner's fourth claim for relief was

19 neither contrary to, nor an unreasonable application of, controlling principles of United States

20 Supreme Court precedent. Petitioner's fourth claim for relief should be denied.

21    D. Fifth Claim

22    Petitioner's fifth claim is that petitioner's right to testify was violated by the

23 court's order that Smithson's attorney could cross-examine him and by the ineffective assistance

24 of counsel in failing to investigate sufficiently to make an informed decision whether petitioner

25 should testify under these circumstances.

26 /////

1    The last reasoned rejection of this claim is the decision of the Sacramento County

2    Superior Court on habeas review.  (Answer, Ex. C.)  The state court addressed this claim as

3    follows:

4           Petitioner's . . . claim is that petitioner's trial counsel was
             ineffective in not making an informed tactical decision as to
5           whether impeachment evidence that codefendant's counsel
             purported to have would have in fact adversely affected petitioner's
6           case had petitioner testified.  Petitioner claims that trial counsel
             failed to subpoena the impeaching evidence from codefendant, to
7           make the informed tactical decision of whether petitioner should
             testify.
8
             The claim is barred by <u>Clark</u>, and meets no exception to that bar.
9
             Further, it would fail on the merits in any event.  Petitioner had no
10          right to discovery of impeachment evidence from his codefendant.
             First of all, under the reciprocal discovery scheme, mere
11          impeachment evidence is not obtainable even from the prosecution
             (<u>People v. Tillis</u> (1998) 18 Cal.4th 284).  Nor is any matter
12          discoverable at all from a codefendant, under the reciprocal
             discovery scheme (see <u>People v. Ervin</u> (2000) 22 Cal.4th 48
13          [defendant has no statutory basis for discovery of codefendant's
             penalty phase witnesses at capital trial]).  Thus, petitioner's trial
14          counsel would have been unsuccessful in any attempt to obtain
             discovery of the codefendant's impeachment evidence.  Trial
15          counsel was not ineffective in this regard.  Petitioner fails to state a
             prima facie claim for relief (<u>Bower, supra</u>).
16
             Nor does petitioner present what trial counsel would have
17          discovered as the impeachment evidence, had trial counsel made
             such an attempt and been successful.  To prevail on an effective
18          assistance of counsel claim on habeas corpus, a petitioner must
             show not only ineffective assistance of counsel, but also that but
19          for the error there is a reasonable probability that the result would
             have been different (<u>Strickland v. Washington</u> (1984) 466 U.S.
20          668).  Petitioner fails to show what the impeachment evidence was
             and that it would have been of such a nature that trial counsel
21          would have changed his mind and instead urged petitioner to
             testify.  Further, petitioner fails to show what petitioner's testimony
22          would have been that would have made a different in the outcome.
             The claim therefore fails, in any event.
23
             The claim is barred by <u>Clark</u>.  Further it is a claim that could have
24          been but was not raised in the appeal, which is an additional bar to
             the claim (<u>In re Dixon</u> (1953) 41 Cal.2d 756, reaffirmed in <u>In re
25          Harris</u> (1993) 5 Cal.4th 813, 829).  Petitioner does not show that
             this claim qualifies for exception to either <u>Clark</u> or <u>Dixon</u>.
26

> Petitioner next claims that his trial counsel was ineffective for not
> attempting to introduce evidence of his testimony in juvenile court.
> The claim is barred under Clark. It also fails under Strickland, in
> that petitioner fails to show that had it been introduced it would
> have made a difference in the outcome.

In re the Matter of the Petition of Charles Frank Spence, 01F08388 (November 13, 2001), at 3-4

(appended to Answer, Ex. C.)

Petitioner's fifth claim lacks merit.[9] First, petitioner's reliance on Brooks v.

Tennessee, 406 U.S. 605 (1972) is unavailing. In Brooks, the Supreme Court invalidated a

Tennessee statute that required a criminal defendant who wanted to testify to do so before any

other defense witnesses could be presented. Id. at 606, 92 S.Ct. 1891.[10] Here, petitioner had an

opportunity, at every stage of the trial, to decide whether or not to take the stand. When the

prosecution rested, the trial court gently probed defense counsel to find out whether petitioner

would choose to testify and, if so, whether he would choose to testify early in his case or toward

the end of his case. (RT 1095-97.) The record reflects that the trial court did this to determine

when each jury and the respective parties and counsel should be present. (Id.) Defense counsel

advised the court he was "leaning toward" petitioner not testifying (RT 1097), but the trial court

did not prevent petitioner from choosing to take the stand. (RT 1095-97.) Petitioner retained the

choice to take the stand even if he had to face the possibility of impeachment by his co-

defendant.

/////

---

[9] Although the question of procedural default "should ordinarily be considered first," a reviewing court need not do so "invariably," especially when it turns on difficult questions of state law. Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Busby v. Dretke, 359 F.3d 708, 720 (5th Cir. 2004). Here, neither party addressed the issue of procedural default; thus, the court will review petitioner's fifth claim on the merits.

[10] Petitioner's reliance on Portuondo v. Agard, 529 U.S. 61, 120 S.Ct. 1119 (2000), is similarly unavailing. In Portuondo, the prosecutor's closing argument that defendant had an opportunity to hear other witnesses testify and tailor his testimony accordingly did not unlawfully burden his right to be present at trial, to confront witnesses against him, or to testify on his own behalf, because prosecutor's comments were directed at defendant's status as witness whose credibility was subject to attack. Id., 120 S.Ct. at 1125-27.

1    Second, despite petitioner's constitutional right to decide whether or not to

2  testify,[11] petitioner's co-defendant retained his constitutional right to cross-examine petitioner,

3  particularly if petitioner took the stand and incriminated Smithson.  See Brown v. United States,

4  56 F.2d 997, 999-1000 (9th Cir. 1932) (co-defendant who testifies in his own behalf and

5  incriminates the defendant becomes a witness "against" him for Confrontation Clause purposes).

6         The trial court's decision to allow petitioner to be cross-examined did not

7  impermissibly burden petitioner's right to testify.

8         Petitioner has failed to demonstrate that the state court's rejection of this claim

9  was unreasonable.  While petitioner claims defense counsel should have subpoenaed this

10  information from the co-defendant's counsel, he cites no authority that suggests co-defendant's

11  counsel would be required to turn over impeachment evidence.  Indeed,

12         [r]eciprocity under the due process clause requires a fair trade,
         defense witnesses for prosecution witnesses, and nothing more.
13         Reciprocity does not require the prosecutor to disclose other
         evidence gathered in response to a compelled defense disclosure
14         that may be used to refute the defendant's case, when the defense is
         not required to do the same following discovery of the
15         prosecution's witnesses.

16  See People v. Tillis, 18 Cal.4th 284, 75 Cal.Rptr.2d 447 (Cal. 1998) (prosecutor did not violate

17  Pen. Code, § 1054.1, by failing to disclose, before trial, evidence concerning the expert witness'

18  arrest and underlying conduct; the impeachment information fell outside the scope of § 1054.1,

19  and since the record did not establish the existence of undisclosed evidence properly discoverable

20  under the statute, the prosecutor committed no discovery violation.)  Cal. Penal Code § 1054.3

21  _____

22         [11] The right of a criminal defendant to testify in his own defense is well established and is
     a "constitutional right of fundamental dimension."  United States v. Pino-Noriega, 189 F.3d
     1089, 1094 (9th Cir. 1999) (quoting United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993).
23   See also Rock v. Arkansas, 483 U.S. 44, 51 (1987).  The right is personal to the defendant, and
     "may only be relinquished by the defendant, and the defendant's relinquishment of the right must
24   be knowing and intentional."  Joelson, 7 F.3d at 177.  However, "while waiver of the right to
     testify must be knowing and voluntary, it need not be explicit."  Pino-Noriega, 189 F.3d at 1095.
25   A defendant is presumed to acquiesce in his attorney's tactical decision not to have him testify
     and a trial court is not required to inform a defendant of his right to testify, or ask whether he
26   wants to testify.  Id. (citing United States v. Edwards, 897 F.2d 445, 447 (9th Cir. 1990).

does not require defense counsel to turn over impeachment evidence to the prosecution, either. Id. There is no statutory basis for the discovery of impeachment evidence from a co-defendant. See Cal. Penal Code §§ 1054 - 1054.10; See also People v. Ervin, 22 Cal.4th 48, 101, 91 Cal.Rptr.2d 623 (Cal. 2000)("no statutory basis exists for the discovery of codefendants' penalty phase witnesses."

With regard to petitioner's ineffective assistance of counsel claim, as noted above, petitioner must demonstrate counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by counsel's performance. Strickland, 466 U.S. at 687-88; 693-94.

Petitioner has failed to identify the impeachment evidence the co-defendant intended to use or to demonstrate that if defense counsel had benefit of the impeachment evidence, counsel would have asked petitioner to take the stand.

Moreover, petitioner's ineffective assistance of counsel claim fails because petitioner cannot demonstrate prejudice. As noted above, this court is not persuaded that had petitioner taken the stand or had defense counsel sought the admission of petitioner's testimony in juvenile court, the outcome of this case would have been different. Even if petitioner's testimony from juvenile court had been admitted, or petitioner taken the stand, he would still be impeached by his admissions to the detectives. Petitioner's admissions to the detective were not ambiguous, and the fact that the jury found petitioner guilty of robbery demonstrates that a defense of "mere preparation" would not have changed the outcome.

The state court's rejection of petitioner's fifth claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent. Petitioner's second claim for relief should be denied.

E. Sixth Claim

Petitioner's sixth claim is that he suffered ineffective assistance of counsel by counsel's failure to request a jury instruction that the evidence of petitioner's mental deficiencies

and drug use was relevant to determine whether petitioner harbored the mental state of an aider and abetter.

The last reasoned rejection of this claim is the decision of the Sacramento County Superior Court on habeas review. (Answer, Ex. C.) The state court addressed this claim as follows:

> This claim is barred by Clark. Further, even if the merits were to be reached, the claim would be rejected because jury instructions were given to a limited extent on the subject, rendering any error under People v. Mendoza (1998) 18 Cal.4th 1114 harmless.

In re the Matter of the Petition of Charles Frank Spence, 01F08388 (November 13, 2001), at 4 (appended to Answer, Ex. C.)

Again, petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by counsel's performance. Strickland, 466 U.S. at 687-88; 693-94.

Petitioner argues that trial counsel was ineffective because he failed to request a jury instruction that the evidence of petitioner's mental deficiencies and drug use were relevant to determine whether petitioner harbored the mental state of an aider and abettor with respect to the murder charge, and whether he harbored the mental state of reckless disregard to human life with respect to the special circumstance charge. Petitioner contends that the jury was instructed that the evidence of mental deficiencies and drug use could be considered only as to the sufficiency of evidence of the specific intent to steal element of robbery or attempted robbery. (CT 602-03.) The jury was not instructed that the evidence could be considered with respect to whether petitioner formed the intent to facilitate or promote Smithson's commission of the offense as an aider and abettor. While the jury was instructed on CALJIC 3.01, informing the jury that the prosecution must prove "the intent or purpose of committing or encouraging or facilitating the commission of the crime," (CT 597), the jury was not similarly instructed that the mental element could be negated by evidence of mental deficiency or intoxication. Petitioner argues that this

resulted in the adjudication of petitioner's mental state on the aiding and abetting charge based on the "general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that intoxication." (CT 603.)

Relying on the decision in People v. Mendoza, 18 Cal.4th 1114, 77 Cal.Rptr.2d 428 (Cal. 1998), petitioner contends he was entitled to present evidence of intoxication solely on the question of whether he was liable for criminal acts as an aider and abettor. See also People v. Minichilli, 161 Cal.App.3d 660, 671 (1984).

Respondent contends petitioner reads the jury instructions too narrowly, and that the jury instructions, taken as a whole, allowed the jury to either use the theory of aiding and abetting liability or the theory of direct and active commission, but that under either theory petitioner was guilty of robbery and felony murder. (Answer at 19.)

Here, the record reflects the following. First, the jury was charged to "[c]onsider the instructions as a whole and each in light of all the others." (CT 564.) The jury was instructed that principals in a crime include those "who aid and abet the commission or attempted commission of the crime." (CT 596 [CALJIC No. 3.00].) The jury was further instructed as follows:

A person aids and abets the commission or attempted commission of a crime when he or she,

(1) with knowledge of the unlawful purpose of the perpetrator and

(2) with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and

(3) by act or advice aids, promotes, encourages or instigates the commission of the crime.

A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime.

Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

1        Mere knowledge that a crime is being committed ad the failure to prevent it does not amount to aiding and abetting.

2

3    (CT 597 [CALJIC 3.01]).

4        "The specific intent required [for the crimes charged] is included in the definitions

5    of the crimes set forth elsewhere in these instructions." (CT 601 [CALJIC 3.31].)

6        You have received evidence regarding a mental disorder or mental defect of the [petitioner] at the time of the commission of

7    the crimes charged namely, felony murder, robbery and the lesser/related crime of attempted robbery. You should consider

8    this evidence solely for the purpose of determining whether [petitioner] actually formed the required specific intent, which is an

9    element of the crime charged in Count One, felony murder, Count 2, robbery, or the lesser/related crime of attempted robbery.

10

11   (CT 602 [CALJIC No. 3.32].)

12       The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or

13   attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that

14   crime.

15       The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a

16   reasonable doubt.

17   (CT 608 [CALJIC 8.21].)

18       If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of

19   robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful

20   purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission

21   of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree,

22   whether the killing is intentional, unintentional, or accidental.

23   (CT 609 [CALJIC 8.27].)

24       [Petitioner] is accused in Count Two of having committed the crime of robbery, a violation of Section 211 of the Penal Code.

25       Every person who takes personal property in the possession of

26   another against the will and from the person or immediate presence

1    of that person accomplished by means of force or fear and with the
     specific intent permanently to deprive that person of the property,
2    is guilty of the crime of robbery in violation of Penal Code Section
     211. . . .
3

4    (CT 610 [CALJIC 9.40].)

5           In California, "[e]vidence of voluntary intoxication is admissible . . . on the issue

6    of whether or not the defendant actually formed a required specific intent." Cal. Penal Code

7    § 22(b).  To be convicted of a substantive offense, an aider and abettor must "act with knowledge

8    of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or

9    of encouraging or facilitating commission of, the offense." People v. Mendoza, 18 Cal.4th 1114,

10   1123, 77 Cal.Rptr.2d 428 (1998) (emphasis in original) (citation omitted).  In Mendoza, a case

11   decided after petitioner's trial, the California Supreme Court reasoned that the intent requirement

12   for aiding and abetting liability is a "required specific intent" for purposes of Cal. Penal Code

13   § 22(b), and since the required mental state cannot be mechanically divided into knowledge and

14   intent, the jury may consider intoxication on both the defendant's knowledge and intent in

15   determining whether the defendant is liable as an aider and abettor.  Mendoza, 18 Cal.4th at

16   1131, 77 Cal.Rptr.2d 428, 959 P.2d 735.  However, the Court also explained:

17          Although evidence of intoxication is admissible on the question of
             aider abettor liability, a jury can still find an intoxicated person
18          guilty as an aider and abettor.  Evidence of intoxication, while
             legally relevant, may be factually unconvincing.  [A]s with any
19          evidence, the jury may give this testimony whatever weight it
             deems appropriate in light of the evidence as a whole.
20

21   Id. at 1133-34, 77 Cal.Rptr.2d 428 (citations and internal quotation marks omitted).

22          As noted by respondent, CALJIC 3.01 specifically told the jury that aiding and

23   abetting liability was based on both an act and a mental component, "with the intent or purpose

24   of committing or encouraging or facilitating the commission of the crime." Id.  CALJIC 3.00

25   and 3.01, together with CALJIC 3.02 and CALJIC 3.32, correctly informed the jury that both

26   knowledge and intent were required  in order to constitute aiding and abetting.  Moreover, the

51

1 aiding and abetting jury instruction, read together with the jury instructions addressing the

2 specific crimes, enabled the jury to find petitioner's specific intent was negated by voluntary

3 intoxication if the jury believed the evidence supported such a finding.

4 Petitioner has again failed to demonstrate prejudice under Strickland. To find

5 petitioner guilty of felony murder, the jury had to find that the victim's death had been caused "in

6 the course of and in furtherance" of the robbery. Thus, the jury also had to find that petitioner

7 had committed robbery, which requires specific intent. Given the verdict, the jury was not

8 persuaded that petitioner's specific intent to commit robbery was negated by his voluntary

9 intoxication.

10 In Solis v. Garcia, the Ninth Circuit held that the trial court's failure to instruct the

11 jury on the intent requirement of the predicate offense on which the aiding and abetting and

12 felony murder charges were based was not reversible because the jury had to find intent to

13 convict the defendant based on the remaining jury instructions. Id., 219 F.3d 922, 927-28 (9th

14 Cir. 2000). Similarly, the jury in petitioner's case could not have convicted petitioner of robbery

15 without finding intent to commit robbery.

16 This court is not persuaded that the outcome of this case would have been

17 different had defense counsel asked for a specific intent instruction on aiding and abetting

18 liability. Nor was the state court's rejection of petitioner's sixth claim for relief contrary to, or an

19 unreasonable application of, controlling principles of United States Supreme Court precedent.

20 Petitioner's sixth claim for relief should be denied.

21 F. Seventh Claim

22 Petitioner's seventh claim is that he was deprived of due process by an erroneous

23 felony murder instruction that reduced the prosecutor's burden of proof beyond a reasonable

24 doubt and misstated the elements necessary to be proven. Specifically, petitioner contends it was

25 /////

26 /////

52

error for the trial court to instruct the jury pursuant to CALJIC Nos. 8.21[12] and 8.27.[13]  Petitioner

contends that California's felony murder rule does not extend to impose liability of aiders-and-

abettors where the actual killing was not in furtherance of a common purpose to rob, but was

instead the result of an accident on the part of another or was the result of independent animus by

another accomplice toward the victim.  (Petition for Writ of Habeas Corpus, filed in the

California Supreme Court on January 21, 2003, at 22-23.)

The last reasoned rejection of this claim is the decision of the California Court of

Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

this claim as follows:

> [Petitioner] claims the trial court committed prejudicial error by instructing the jury [petitioner] should be convicted of first degree murder if his accomplice in the robbery killed the victim by accident.  [The court] disagree[s] with [petitioner's] claim.
>
> The trial court gave to the jury the following instructions on felony murder:
>
> "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime.
>
> "The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."  (CALJIC No. 8.21.)

_____

[12]  The instruction, as given, stated:  "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime.  The specific intent to commit and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."  Id.

[13]  CALJIC 8.27, as given, stated:  "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."  Id.

"If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." (CALJIC No. 8.27.)

[Petitioner] does not dispute that his actions aided, promoted or encouraged the commission of a robbery or attempted robbery. Rather, he argues the felony-murder rule should not serve as a basis to convict an accomplice where the killing of an innocent person occurred accidentally. He cites no direct authority for his argument. Instead, [petitioner] claims our Supreme Court has shown an intent to narrow the judicially-created scope of the felony murder rule. So narrowed, the rule, he argues, may no longer extend to accomplices of crimes specified in section 189 that result in accidental killings.

In *People v. Pulido* (1997) 15 Cal.4th 713, the Supreme Court acknowledged that its past "descriptions of an accomplice's liability [under the felony murder rule] have limited complicity to killings occurring while the killer was acting in furtherance of a criminal purpose common to himself and the accomplice [see *People v. Washington* (1965) 62 Cal.2d 777; *People v. Vasquez* (1875) 49 Cal. 560], or while the killer and accomplice were jointly engaged in the felonious enterprise [see *People v. Martin* (1938) 12 Cal.3d 466; *People v. Perry* (1925) 195 Cal. 623]." (*People v. Pulido, supra*, 15 Cal.4th at p. 719.)

Under the first line of cases, accomplice liability arises when the killing is committed ""in furtherance of their common purpose to rob.' (Citations.)" (*Id.* at p. 721.) Under the second line, "the killing need have no particular causal or logical relationship to the common scheme of robbery; accomplice liability attaches, instead, for any killing committed while the accomplice and killer are 'jointly engaged' in the robbery. (Citations.)" (*Id.* at p. 722.)

The *Pulido* court did not determine whether one of these lines of cases was no longer controlling. However, [petitioner] claims the *Pulido* court has shown an intent to favor only the first line. Thus, he argues [the court] should apply the felony-murder rule only where the killing occurs in furtherance of the defendants' common purpose to rob. Further, he asserts an accidental killing cannot, as a matter of logic, be committed in furtherance of a common purpose, and thus should not trigger liability under the felony-murder rule. [The court] reject[s] both of [petitioner's] claims.

54

First, because the *Pulido* court did not disapprove either line of felony murder cases, both are still valid and [the court is] duty-bound to comply with the Supreme Court's directives in each. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.) Felony murder liability would clearly attach to [petitioner] under the *Martin-Perry* line of cases. The killing occurred while both defendants were jointly engaged in the commission of a robbery.

Second, even if the *Martin-Perry* line of cases was no longer valid law, liability would attach to [petitioner] under the *Washington-Vasquez* line of authority as well. Under *Washington*, "all persons aiding and abetting the commission of a robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design." (62 Cal.2d at p. 782.)

The evidence demonstrates both [petitioner] and Smithson shared a common design to rob the victim and share the proceeds. The evidence also shows the victim was killed while Smithson was acting in furtherance of their common design to rob. This evidence sufficiently supports a conviction of felony murder.

However, [petitioner] claims "it is logically impossible to commit an accidental killing in furtherance of a common design to commit a felony. To commit an act in order to further a plan necessarily implies a purposeful act rather than an accidental one." [Petitioner's] formulation attempts to graft an element of premeditation or malice onto the act of killing and thereby misapplies the felony-murder rule. The issue is not whether a defendant plans or intends to kill. The issue is whether a killing occurred in the course of the commission of a felony and, under *Washington*, whether that killing aided in the progression and consummation of the felony. How that killing occurred and whether it was intentional are irrelevant.

"'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life. "Under well-settled principles of criminal liability a person who kills – whether or not he is engaged in an independent felony at the time – is guilty of murder *if he acts with malice aforethought*. The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state–and thereby to render irrelevant evidence of actual malice or the lack thereof – when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it." [Citations.]'" (*People v. Tabios* (1998) 67 Cal.App.4th 1, 7, quoting *People v. Hansen* (1994) 9 Cal.4th 300, 307, italics in original.)

/////

55

> The jury instruction accurately described the current law governing
> the crime of felony murder.

(Opinion at 40-44.)

In general, a challenge to jury instructions does not state a federal constitutional claim. See <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983). In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the Fourteenth Amendment." <u>Prantil v. California</u>, 843 F.2d 314, 317 (9th Cir. 1988) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973)). To prevail on such a claim petitioner must demonstrate that the "ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'" <u>Middleton v. McNeil</u>, 541 U.S. 433 (2004) (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 72, 112 S.Ct. 475, 482 (1991)(quoting <u>Cupp</u>, 414 U.S. at 147)). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" <u>Prantil</u>, 843 F. 2d at 317 (quoting <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th Cir. 1984)).

Also, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776, 66 S.Ct. 1239 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." <u>Id.</u> (citation omitted); <u>see</u>, <u>e.g.</u>, <u>Coleman v. Calderon</u>, 210 F.3d 1047, 1051 (9th Cir.2000) (finding <u>Brecht</u> error where "at the very least" the court could not "'say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'") (citation omitted). The <u>Brecht</u> standard

/////

1  applies retroactively.  See, e.g., McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir.1993) (applying

2  Brecht to pre- Brecht final judgment), cert. denied, 510 U.S. 1020, 114 S.Ct. 622 (1993).

3          The California Court of Appeal addressed the merits of petitioner's claim and

4  applied the correct standard.  In doing so, the appellate court noted that petitioner was convicted

5  of first degree murder on a felony-murder theory which required that the jury conclude that the

6  killing occurred as a "direct causal result" of a felony.  The appellate court reviewed petitioner's

7  arguments and concluded that the trial court appropriately instructed the jury with the CALJIC

8  felony-murder jury instructions.  The appellate court distinguished the instant case from Pulido,

9  supra, because the killing occurred while both defendants were jointly engaged in the

10 commission of a robbery.  The appellate court also held that liability would attach to petitioner

11 under either the narrow or broad view of felony-murder accomplice liability.

12          Moreover, petitioner has not shown the jury instruction had a substantial and

13 injurious effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 637.  The state

14 court's determination that petitioner could have been convicted under either standard of felony-

15 murder accomplice liability was not unreasonable; thus any instructional error could not have

16 resulted in actual prejudice.

17          In his California Supreme Court petition, petitioner sought deferment of this issue

18 pending resolution of People v. Cavitt, S105058, which was subsequently decided in 2004.

19 People v. Cavitt, 33 Cal.4th 187, 91 P.3d 222 (Cal. 2004).  However, the Cavitt court did not

20 narrow the reach of the felony murder rule in a way that would assist petitioner here.  Rather, it

21 held that culpability for felony murder based on a killing by a co-felon requires "both a causal

22 relationship and a temporal relationship between the underlying felony and the act resulting in

23 death."  Cavitt, 33 Cal.4th at 193.  "The causal relationship is established by proof of a logical

24 nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying

25 felony the nonkiller committed or attempted to commit.  The temporal relationship is established

26 /////

by proof the felony and the homicidal act were part of one continuous transaction." Id. Both relationships are present under the facts of the instant case.

The state court's rejection of petitioner's seventh claim for relief was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent. Petitioner's seventh claim for relief should be denied.

For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 5, 2009.

UNITED STATES MAGISTRATE JUDGE

001/spen1987.157

58